UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

**FILED**
DEC 1 3 2021
Clerk, U.S. District Court
Eastern District of Texas

MORINVILLE, )
)
    Plaintiff, )
)
v. )    Case No. 20-cv-00980
)
OVERWATCH DIGITAL )
HEALTH, INC. ET AL., )
)
    Defendants )
)

# PLAINTIFF'S REPLY TO MOTION OF BIOEYE, LTD. FOR SUMMARY JUDGEMENT

Plaintiff Paul Morinville files this reply to Defendant BioEye, LTD's. ("BioEye") Motion for Summary Judgment ("Motion"). BioEye engaged in a fraud by participating in a scheme to obtain control of my technology and intellectual property in order to unjustly enrich its investors.

In furtherance of its fraud, BioEye has deliberately withheld important documents from this Court and in contravention of its obligation under this Court's discovery rules and has omitted key facts and information (all of which are fatal to its case) in the declarations of its board members, officers, and executives. The deliberate failure to disclose these important documents as well as the omission of adverse information directly refutes what BioEye disingenuously claims in its Motion are "conclusive" and "undisputed facts". For undisputed facts to be conclusive, they must include *all* the facts, not just the facts that BioEye prefers while it deliberately hides the facts that unequivocally undermine its Motion.

BioEye's argument is primarily predicated on the provably false assertion that BioEye and Overwatch Technologies, Inc. ("Overwatch") did not merge into a single entity (hereinafter

"Overwatch/BioEye"). This false assertion is at the core of the fraud that enabled BioEye to abscond with my technology and intellectual property, which has been valued at approximately $39 million dollars.

1. BioEye asserts on page 8 of the Motion at C, 36 that: "The submissions to the ASX and public statements regarding the RTO..."[1] reflected that BioEye was a separate entity from Overwatch.

> 36. The submissions to the ASX and public statements regarding the RTO reflected that Overwatch and BioEye always retained their separate legal identities. (Ferri Decl. ¶ 10, Exs. D & E; Barrett Decl. Ex. K; Correia Decl. ¶ 14, Ex. J).

That assertion is false. EXHIBIT A is the January 2020 Overwatch/Bioeye Application for In-Principal Advice ("First ASX Application"). The First ASX Application was the initial application that Rision filed with the Australian Securities Exchange ("ASX") for the regulatory approval of Overwatch/BioEye's reverse takeover (merger) of Rision.[2]

Contrary to the position they've taken in this case and in its Motion, BioEye informed the ASX in the First ASX Application that it had indeed merged with Overwatch by January 2020 (when the First ASX Application was submitted to the ASX). On page 11 the First ASX Application states: "*As a result of its acquisition of BioEye*, (emphasis added) Overwatch also

---

[1] A reverse takeover (RTO) is a process whereby private companies can become publicly traded companies without going through an initial public offering (IPO)...To begin, a private company buys enough shares to control a publicly-traded company. The private company's shareholder then exchanges its shares in the private company for shares in the public company. At this point, the private company has effectively become a publicly-traded company. See https://www.investopedia.com/terms/r/reversetakeover.asp (last accessed December 11, 2021)

[2] The ASX is an Australian public company that operates Australia's largest public equities market. The ASX is regulated by the Australian Securities & Investment Commission which is an agency of the Australian government. See https://en.wikipedia.org/wiki/Australian_Securities_Exchange (accessed December 11, 2021).

conducts business in Tel Aviv, Israel where additional engineering resources and research and development are located." Clipped from the First ASX Application:

| Where are the entity's main business activity or activities conducted?[12] | Overwatch's current business activities are solely within the United States. Overwatch's main office in Dallas, Texas is where the company's U.S. engineering team, sales and marketing and executive officers are located. As a result of its acquisition of BioEye, Overwatch also conducts business activities in Tel Aviv, Israel where additional engineering resources and research and development efforts are located. |
|---|---|

The First ASX Application, was reviewed and authorized by BioEye (as well as the other defendants in this case) and is a critical document that was not disclosed by BioEye in discovery. Indeed, BioEye avoided any substantive discussion of the First ASX Application in all of declarations that BioEye submitted of its board members, officers, or executives or in BioEye's version of "undisputed facts" in its Motion notwithstanding that BioEye did find it fit to disclose in discovery the ASX applications of April 2020 and July 2020.[3]

2.  While BioEye goes into great detail in its Motion and supporting affidavits to explain that the second ASX application of April 2020 submitted to the ASX shows BioEye and Overwatch as separate entities, BioEye did not provide (because none exists) in any discovery, declarations or anywhere else that BioEye's Board of Directors voted to authorize Bioeye to somehow become "unacquired" by Overwatch between the time of the First ASX Application in January 2020 (which advised the ASX that, in fact, Overwatch had acquired BioEye) and the subsequent ASX applications. There are also no Overwatch board minutes showing that Overwatch's Board of Directors had voted for Overwatch to divest itself of BioEye.

3.  Throughout this case in virtually every filing with this Court, BioEye has asserted that it never merged with Overwatch. In its Motion on page 8, at C, 35 BioEye offers by way of

---

[3] The only acknowledgements of the First AXS Application were in fleeting references to it only noting that it has been filed (while omitting any discussion of BioEye's admission that Overwatch and BioEye had merged). See Motion at Page 9; the Barrett Declaration at Paragraph 11; and the Correia Declaration at Paragraph 11.

4

proof that the entities never merged by noting that Overwatch and BioEye maintained separate legal identities.

Page 8 of the Motion:

> 35.   Overwatch and BioEye maintained their separate legal identities at all times from July 1, 2019, through September 30, 2020. (Ferri Decl. ¶ 9, Ex. C; Correia Decl. ¶¶ 12-14, Ex. I; Plaintiff's Response to Joint Defendant's 12(c) Motion at p. 7).

That offer of proof is directly contradicted by the very documentation that Overwatch/BioEye (through its Board of Directors, officers, and management) created, authorized, and distributed to investors (existing and prospective), Australian regulators on the ASX, and others to describe the Overwatch/BioEye entity.

EXHIBIT B is a letter to Overwatch/BioEye Convertible Note and Promissory Note Holders dated March 27, 2020 (the "March 27, 2020 Investor Letter") seeking additional investment capital, which was reviewed and authorized by BioEye, and distributed by Overwatch's Chief Executive Officer, Terry Fokas, to current and prospective Overwatch/BioEye investors. The March 27, 2020 Investor Letter specifically states that Overwatch had acquired BioEye. **"(as noted in my previous correspondence, Overwatch entered into an agreement in September 2019 to acquire Israel-based BioEye)."** Clipped from page 1 of the March 27, 2020 Investor Letter:

### Overwatch Funding

Since its inception in February 2019, Overwatch has raised approximately US $___ million through sales of convertible and promissory notes. The intended use of these funds was to build out our epilepsy monitoring and alerting application (the "Overwatch App") and to implement machine learning and artificial intelligence training algorithms to enhance accuracy. In addition, these funds were to be used to pay development costs for the Eympact App (concussion detection application) and the Eympair App (drug-detection application) which are based on technology created by BioEye, Ltd. (as noted in my previous correspondence, Overwatch entered into an agreement in September 2019 to acquire Israel-based BioEye).

EXHBIT C is pages 1-3 of an investor presentation entitled "RISION, LTD - OVERWATCH/BIOEYE CORPORATE PRESENTATION" ("Overwatch/BioEye Corporate Presentation"),[4] which was reviewed, and authorized by BioEye, and used in distribution to potential investors to attract investment into Overwatch/BioEye. EXHIBIT C shows that the merged "Overwatch/BioEye" entity was tangibly created because BioEye named it and sought investment in it.

EXHIBIT D is page 24 of the Overwatch/BioEye Corporate Presentation. EXHIBIT D shows that members of BioEye's Board of Directors [5] are also members of the Overwatch/BioEye Board of Directors.

EXHIBIT E is pages 25-26 of the Overwatch/BioEye Corporate Presentation. EXHIBIT E shows the Overwatch/BioEye Management Team included Terry Fokas as the CEO (Mr. Fokas was formerly the CEO of Overwatch); Eran Ferri as the President (Mr. Ferri was formerly the CEO of BioEye); Dovi Yellen as the Chief Scientist (Mr. Yellen was formerly the Chief Scientist of BioEye); and me as Vice-President of Product Development for the merged entity.

EXHIBIT F shows an organizational chart of Overwatch/BioEye in January 2020 determining the chain of command of Overwatch/BioEye and the organizational matrixed relationships supporting the Overwatch/BioEye products. In EXHIBIT F, BioEye's name is not listed anywhere, and the various products being developed by Overwatch/BioEye are noted by product name (e.g. Overwatch App, Cognitive Decline, Eympair and Eympact) without reference to separate ownership of such products by Overwatch or BioEye. Product development is a single unit split by function to support these Overwatch/BioEye products, with Engineering located in the US, and Innovation and Research in Israel. EXHIBIT F also shows the reporting chain of

---

[4] The full presentation was EXHIBIT 1 of the Joint Defendants reply to their original Motion to Dismiss.
[5] Members of the BioEye's Board of Directors are Clive Barrett and Emmanuel Correia.

command with all business lines responsible to and ultimately reporting to Mr. Fokas as the merged entity's CEO. These organizational and reporting relationships are the foundation of how a unitary company is structured and managed. Nothing in these relationships show any separate existence between Overwatch and BioEye. In fact, they show the opposite, that Overwatch and BioEye were indeed operating as a single entity.

To summarize, EXHIBIT A, the First ASX Application filed with the Australian security regulators, states explicitly that Overwatch acquired BioEye. EXHIBIT B shows that the merged Overwatch/BioEye entity received investment in the form of convertible and promissory notes issued to investors, and *explicitly states that Overwatch acquired BioEye in September of 2019*. Importantly, EXHIBIT B does not identify any conditions precedent for that acquisition. EXHIBIT C shows that the BioEye marketed the merged Overwatch/BioEye to investors to attract investment. EXHIBIT D shows that BioEye's Board of Directors became members of Overwatch/BioEye's Board of Directors. EXHIBIT E shows that the management teams of Overwatch and BioEye were operating under a combined Overwatch/BioEye entity. EXHIBIT F shows that the organizational and reporting chart of the merged Overwatch/BioEye entity.

Exhibits A, B, C, D, E, and F written, reviewed, and authorized by BioEye, fly in the face of BioEye's assertions (and purported "undisputed facts") that there never was a merged entity. If the merger did not take place, as BioEye now adamantly asserts, then BioEye perpetrated a fraud on its investors, the public and Australian securities regulators.

4. Further evidence of a merged Overwatch/BioEye entity, is found in a March 20, 2020 email, which was disclosed in discovery by Overwatch, between Fokas, Barrett and Correia discussing funding of the merged entity (EXHIBIT G). The attachment to that email titled "Overwatch Monthly Expenses Commencing on April 1,2020" lists employee costs. Included in

7

the list of employees are former BioEye employees Dovi Yellen and Rotem Tzuk. (EXHIBIT H). Clipped from EXHIBIT H:

| Employee/Function | Previous Compensation | Reduced Compensation |
|---|---|---|
| Dovi Yellin | $9,500/month | $7,500/month |
| Rotem Tzuk | $10,000/month | $7,500/month |

5.      In May 2020, Barrett and Correia ordered Fokas to direct all Overwatch/BioEye's efforts and funding to the development of Eympact to perform sideline concussion testing for the Australian Football League ("AFL"). I was asked to work exclusively on Eympact to finalize product development for sideline concussion testing for the AFL.

Unknown to anyone, Messrs. Barrett and Correia were secretly negotiating a contract between the AFL and Bioeye alone. EXHIBIT I is Correia's discovery document number ID DOC 437. On page 4 are the call notes of Correia taken during a call on June 11, 2020 (several months prior to my termination in September 2020). Correia writes "AFL paperwork" next to the name "Rosich" and highlights it in yellow. The name "Rosich" refers to Steve Rosich, a former AFL executive and Chairman of the Board of Directors of Rision who was also the point person for discussions with the AFL.

The documents referred to by "AFL paperwork" were withheld from discovery by Messrs. Barrett and Correia. "AFL paperwork" likely refers to a contract at some stage of negotiations taking place between BioEye and the AFL at the very same time that Barrett had instructed me to focus all my efforts on Eympact.

From the very beginning of this case, BioEye has attempted to hide the existence of an AFL contract. In BIOEYE LTD.'S ANSWER TO PLAINTIFFS' ORIGINAL COMPLAINT dated

8

03/30/2021 (the "BioEye Answer"), BioEye *"specifically denies that it (a) ... (b) has contracted with the AFL as of the date that the Complaint was filed."* However, in October 2020 (several weeks after I was terminated in September 2020), Mr. Barrett contacted me and inquired if I would go to Australia to work on the field with AFL personnel during the AFL preseason (which would commence in November 2020) using the sideline concussion detection product I had developed. It is simply not plausible that BioEye and the AFL had not entered into a contract prior to Mr. Barrett's call in October 2020 requesting that I undertake concussion sideline testing during the AFL preseason. In addition, EXHIBIT J, which is an article by the Guardian dated 3/12/2021, that was published 18 days *prior* to the filing of the BioEye Answer shows that BioEye had indeed contracted with the AFL to perform sideline concussion testing.

    Prior to BioEye's merger with Overwatch, BioEye did not have any revenues, any customers, or any viable commercial products. However, because of my technology and intellectual property, which included the creation of Eympact as a sideline concussion detection product during high impact sporting events, BioEye was able to enter into an agreement with the AFL to test Eympact during the 2020 AFL preseason and the 2021 AFL regular season thereby significantly increasing the value of BioEye.

    As BioEye indicate on page 11, item 56 of their Motion, the top reasons for ASX denial of August 2020 was "[(a)] the early stay of Overwatch's proposed business operations and the limited history of the proposed business available to the ASX; [(b)] the very early stage of BioEye's proposed business operations and unproven business model, including the fact that Eympair and Eympact have not yet been commercialised;". The AFL agreement secretly in negotiations by Messrs. Barrett and Correia would overcome the top reasons for the ASX denial enabling the Defendants to RTO with BioEye alone.

This agreement with the AFL provided ample motivation for the Defendants to ensure the RTO (which would have included Overwatch, and which would have significantly reduced the amount of equity that would have inured to the BioEye's shareholders and investors if they had to share the proceeds of the RTO with Overwatch's shareholders and investors) did NOT take place.

6. Overwatch/BioEye held itself out to be a single, unified entity to investors, customers, government regulatory agencies, employees, vendors, and the public. Whether Overwatch/Bioeye was a merger, an acquisition, a joint venture, a partnership, or some other arrangement, Mr. Fokas, as the CEO who managed both entities, had the power and the authority to bind both Overwatch and BioEye.

7. BioEye argues that I accepted the risk of a payout that was contingent upon the closing of the merger with Rision and the RTO, and because that did not happen, I am not owed anything. BioEye's also argues that it owes me nothing because there is no contract between BioEye and me and because Fokas couldn't bind BioEye to any of Overwatch's obligations.

These arguments are tainted by the fact that the merger between Overwatch/BioEye and Rision was scuttled by the other defendants in this case (as more particularly discussed in Plaintiff's Second Amended Complaint); that BioEye did merge with Overwatch into the Overwatch/BioEye entity (as is abundantly evidenced in their own documents); and that BioEye controls my technology and intellectual property (which I never assigned to either Overwatch or BioEye) and is profiting from it without paying me.

8. BioEye also argues that I did not write any code, so I did not build the technology and intellectual property, and therefore am owned nothing.

However, writing code is not what creates technology and intellectual property. It is the "what" to be coded that does. A coder having no idea of "what" to code cannot just write code

until the cows come home and ever expect to produce any product for any market. They can only produce a mumbo-jumbo bunch of code.

Someone must create the "what" to code and this "what" is encapsulated in a requirements document that describes to the coder "what" to code. A requirements document starts with the customer and ends with a description of "what" to code. I identified the market segments, identified potential customers, extracted customer needs, and then created use cases; page flow diagrams and data requirements for both the phone app; customer web apps; internal administration apps; test plans; database normalization schemes; data security requirements; and more, all of which rolled into requirements documents for the various products. These requirements documents that I created were used by the BioEye to explain to the coders "what" to code and the coders coded the products to meet the requirements documents.

At the time I started working for Overwatch/BioEye in July 2019, BioEye had no customers, no marketable products, no identified market segments, and no revenue. BioEye's sole product (that was still in early-stage development) had only the ability to extract ocular biomarkers from a video, put them on a server, and identify differences in these biomarkers by applying artificial intelligence algorithms. BioEye had no customer interfaces, no administrative interfaces, no database, inadequate security, no backend server applications and was lacking virtually all aspects of a marketable product. In short, the BioEye's product was unworkable and unmarketable as evidenced by the fact that BioEye did not even have a single beta customer.

Everything that BioEye coded after July 2019 was based on what I researched, created, developed, and wrote into the requirements documents that resulted in the products Eympair, Eympact and Overwatch IDT, and therefore is my technology and intellectual property.

9. Overwatch commissioned a valuation of Eympact and Eympair products. The valuation was performed under a variety of financial models including Future EV/Sales, Future

EV/EBITDA, Future EV/EBIT, Discounted Cash Flows, and Average Valuation. The Average Valuation of Empact is approximately 12 million dollars, and the Average Valuation of Eympair is over 15 million dollars. Overwatch IDT, the sepsis detection product, was not part of the valuation, but it is reasonable to assume that its valuation is similar, with an Average Valuation of potentially 12 million dollars. Combined, the Patent and technology that I developed is valued at approximately 39 million dollars. Eympact's valuation was performed prior to the AFL contract, thus it would valuate much higher now. BioEye's fraud transferred that value from me to BioEye, leaving me with a loss and BioEye with an unjust enrichment of potentially 39 million dollars, which continues to grow.

10. Even if BioEye's claims are to be taken as true (they are not) – that BioEye never merged with Overwatch so there was never any agreement between myself and BioEye – it still fails to address the fact that BioEye is now in exclusive control of my technology and intellectual property and profiting from it; I did not assign it to BioEye (nor did I assign it to Overwatch so any purported assignment of my technology and intellectual property from Overwatch to BioEye is null and void); and they did not pay me for it. At a minimum, I should be compensated for the value of my technology and intellectual property, which has been valued at $39 million dollars, by BioEye under a theory of quantum meruit.

Dismissing BioEye from this case would allow BioEye to keep and profit from my technology and intellectual property and would result in a grave injustice to me.

BioEye has claimed that its facts are "conclusive" and "undisputed" and therefore BioEye should be dismissed on summary judgment. However, as discussed above, BioEye has hidden critical facts by failing to disclose them in discovery and in the declarations of its board members, officers and executives. Facts cannot be "conclusive" nor "undisputed" when the proffered facts are either in dispute, contradicted by BioEye's own documents or have been omitted. The facts of

Overwatch and BioEye's merger are legitimately in dispute and for all the foregoing reasons, I ask that the court deny BioEye's Motion.

## VERIFICATION

I, Paul Morinville, believe that the previous responses are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the previous is true and correct.

Date: Dec 13, 2021

Paul Morinville
3902 Sequoia Trail West
Georgetown, TX 78628
paul@morinville.net
512-294-9563

*[signature]*

14

## CERTIFICATE OF SERVICE

  I hereby certify that on December 13, 2021, a true and correct copy of the foregoing was served by email on the parties listed below.

Lenard M. Parkins
R.J. Shannon
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: lparkins@parkinslee.com rshannon@parkinslee.com
Phone: 713-715-1660

Overwatch Digital Health, Inc.
c/o Terry Fokas, Esq.
17440 Dallas Parkway
Suite 230
Dallas, TX 75287
terryfokas_esq@yahoo.com

                _____
                Paul Morinville