# **EXHIBIT 1**

**Plaintiff's Answers to Defendant BioEye Ltd.'s First Set of Interrogatories, Requests for Production, and Requests for Admission to Plaintiff**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **MORINVILLE,** | ) | Case No. 20-cv-00980 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **OVERWATCH DIGITAL** | ) | |
| **HEALTH, INC. ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S ANSWERS TO DEFENDANT BIOEYE LTD.'S FIRST SET OF INTERROGATORIES, REQUESTS FOR PRODUCTION, AND REQUESTS FOR ADMISSION TO PLAINTIFF**

### III. INTERROGATORIES

INTERROGATORY NO. 1: Identify each oral or written contract between or among you and any of the Defendants, indicating the date such contract was entered, the material terms of such contract, the individual(s) making such contract, any entity on behalf of which the individual(s) entered such contract, and whether the contract was written or oral.

>   Answer:  See INTERROGATORY NO. 2 below.

INTERROGATORY NO. 2: Identify each oral or written communication made to you regarding employment, engagement as a contractor, and/or compensation to which you would be entitled in any way related to your claims in this lawsuit, indicating the date of such communication, the individual(s) making such communication, any entity on behalf of which the individual(s) made such communication, the substance of such communication, and whether such communication was written or oral.

>   Answer:  An oral contract made by Terry Fokas toward the end of July 2019 to provide consulting services for marketing and product management for drug detection and concussion markets using BioEye technology in exchange for a monthly payment of $15,000 and 2% of Rision shares at the RTO planned for April 2020.

INTERROGATORY NO. 3: Identify any equity securities or interests of any kind that you held in Overwatch/BioEye, Overwatch, or BioEye from January 1, 2019, to December 21, 2020,

indicating with respect to each such security or interest the (a) entity, (b) nature, (c) amount, (d) date acquired, and (e) date of transfer or other disposition.

      Answer:  None.

INTERROGATORY NO. 4: Identify and describe in detail each action of BioEye, Clive Barrett, Emmanuel Correia, or Rision Limited that you contend terminated, cancelled, or otherwise caused the RTO to not occur.

      Answer:  The Defendants refused to recapitalize the merged entity after the RTO was delayed thus starving the merged entity of funding and causing the RTO to fail.

INTERROGATORY NO. 5: Identify the source of the payments that you received related to your allegations in the Complaint, indicating the (a) date, (b) amount received, (c) method of payment, and (d) entity making such payment to you.

      Answer:  Access to this banking information is difficult, and this information can be obtained from Overwatch.

INTERROGATORY NO. 6: Identify any written or oral agreement between you and any entity that you contend assigned any interest in the Patent Application to you, indicating the date of such agreement, the material terms of such agreement, the entity making such agreement, the individual(s) making the agreement on behalf of any entity, and whether the agreement was written or oral.

      Answer:  No agreement exists that assigns any of my rights to any intellectual property developed by me to any entity, including the Defendants.

INTERROGATORY NO. 7: Identify the individual who you alleged in the Complaint offered you a $15,000 per month in salary and 2% of Rision shares upon completion of the RTO.

      Answer:  Terry Fokas.

INTERROGATORY NO. 8: Describe how you calculated the value of the Rision Limited shares you allege that you were promised, indicating the source of any information you used and any documents upon which you relied.

      Answer:  I was given that figure by Terry Fokas.

INTERROGATORY NO. 9: Identify the individual who offered you $15,000 per month in salary and 2% of Rision shares upon completion of the RTO, as you allege on page 4 of the Complaint.

      Answer:  Terry Fokas

INTERROGATORY NO. 10: Identify the individual who asked you to continue work without pay until the RTO occurred, as you allege on page 4 of the Complaint.

Answer:  Terry Fokas

INTERROGATORY NO. 11: Identify the individual who asked you to continue work without pay until the RTO occurred, as you allege on page 4 of the Complaint.

Answer:  Terry Fokas

INTERROGATORY NO. 12: Identify the individual who asked You to continue to develop BioEye products for the AFL, as you alleged on page 5 of the Complaint.

Answer:  Terry Fokas

INTERROGATORY NO. 13: Identify the individual who asked you to identify COVID-19 related markets for BioEye technology, as you alleged on page 5 of the Complaint.

Answer:  Terry Fokas

INTERROGATORY NO. 14: Identify the individual who told you that you would not be paid your unpaid salary or given any value for the shares you had been promised in Rision Limited, as you allege on page 6 of the Complaint and the date of such communication.

Answer:  Terry Fokas

INTERROGATORY NO. 15: Identify and describe in detail your legal and factual basis, including any documents, for your assertion that Overwatch and BioEye had merged prior to July 2019.

Answer:  When I was hired, Terry Fokas explained to me that BioEye and Overwatch were a merged entity.  I was working on Overwatch products that used BioEye technology and were represented as Overwatch products.  An organizational chart was created showing the merged Overwatch/BioEye entity including former BioEye employees under the merged entity reporting to Terry Fokas as the CEO of the merged entity.  This included Eran Ferri, the former CEO of BioEye, who was listed as the COO of the merged entity reporting to Terry Fokas as the CEO of the merged entity.  Product development in Israel and the U.S. were also listed in the organizational chart under the merged entity.  The organizational chart shows cross functional support from Chris Czura for clinical trials for all products under the merged entity.  The BioEye name is eliminated from the org chart.  The chain of command in the organizational chart was in practice internally.  For example, emails were sent to Terry Fokas asking for direction as the CEO of the merged entity from Dovi Yellen and Eran Ferri.  Investment documents, including those that I was asked to send to investors that I had previously done business with (and I did send them to investors), portrayed the merged entity as the entity receiving investment with a board of directors that included Barrett and Correia, and management team with Terry Fokas as the CEO and myself as a VP under the merged entity.  A website was in development under the merged entity.  All product documentation distributed to potential customers and partners were under the merged

entity. The deal with Cosenza Hospital was a contract with "Overwatch/BioEye" as a merged entity. The company was put out both internally and externally as a merged entity. Investment was accepted by the merged entity for the merged entity.

INTERROGATORY NO. 16: Identify and describe in detail your legal and factual basis, including any documents, for your assertion that you are entitled to 100% ownership of the Patent Application.

> Answer: There are no agreements assigning my rights to the patent application to any entity. I did not assign my rights and I did not intend to assign my rights.

INTERROGATORY NO. 17: Identify and describe in detail your legal and factual basis, including any documents, for your assertion that you are entitled to payment of any salary owed to you by Overwatch/BioEye from each of the Joint Defendants.

> Answer: I was hired to perform marketing for Overwatch products that use BioEye technologies by the merged Overwatch/BioEye entity.
>
> It soon became apparent that Bioeye did not possess the technologies needed for the police and concussion markets. My job then expanded to include product development.
>
> I developed the technologies to address the markets, created all requirements, mapped the products to the market, sized the market, tested the market, and refined product requirements to map to the market. Then I drove the development of the products through engineering in US and Israel, wrote and executed test plans, tested products, refined product requirements to the findings of the test plans, tested the products with customers, designed the phone app interfaces and the back end customer databases, storage, security, regulations, and customer and management interfaces. I designed the customer intake processes and financial sales reporting logic and interfaces. I developed pricing models and produced financial forecasts.
>
> I was not paid for my work product and that work product is now exclusively in the possession of the Defendants.
>
> There are no agreements assigning my rights to the technologies or any other intellectual property that I developed to any of the Defendants.

INTERROGATORY NO. 18: Describe in detail any specific inquiries made into the evidentiary and factual support for the allegations you made in the Complaint prior to filing the Complaint in this matter.

> Answer: I spoke with Terry Fokas on numerous occasions regarding my pay and the rights to my technology and intellectual property. He indicated that BioEye had taken it, that the Defendants had refused all attempts to recapitalize the company, and they were not going to consummate the RTO, which meant that they took possession of my work product, and I would not be paid.

>Around October 2020, I spoke with Eran Ferri and Clive Barrett about a potential business relationship with a new company I would startup in the US. I thought that we could work out a solution short of litigation that would enable me to access and use my technology. Barrett offered to invest in the new company and Barrett asked me to go to Australia to help with the AFL. However, Barrett said that he would not put anything in writing and delayed discussing any terms.
>
>Unable to access my technology, I was left with no alternative but to file this suit.

INTERROGATORY NO. 19: If you deny or make a qualified response to any of the Requests for Admissions herein, identify and describe in detail your legal and factual basis, including any documents, supporting such denial.

## IV. REQUESTS FOR PRODUCTION

REQUEST NO. 1: Any document comprising, memorializing, or referencing a contract between you and Overwatch/BioEye, Overwatch, BioEye, Barrett, Correia, or Rision Limited.

>Answer:  These documents are being provided in dropbox.

REQUEST NO. 2: Any document comprising or referencing any communication between you and Overwatch/BioEye, Overwatch, BioEye, Barrett, Correia, or Rision Limited regarding any compensation to be paid to you.

>Answer:  These documents are being provided in dropbox.

REQUEST NO. 3: Any document reflecting payment of any compensation that you received on account of your employment or engagement by Overwatch/BioEye, Overwatch, or BioEye, including any documents comprising or referencing checks, transfers of funds, bank statements, pay stubs, W-2, W-9, or tax return.

>Answer:  These documents are difficult to obtain and can be obtained from Overwatch.

REQUEST NO. 4: Any document comprising or referencing any business card indicating that you were an employee or officer of BioEye.

>Answer:  These documents are no longer in my possession.

REQUEST NO. 5: Any document identified in your response to the Interrogatories.

>Answer:  These documents are being provided in dropbox.

## V. REQUESTS FOR ADMISSION

REQUEST NO. 1: Admit that the document attached hereto as Exhibit 1 is a true and correct copy of the Patent Application.

>Answer:  Admit

REQUEST NO. 2: Admit that you electronically signed the declaration contained in the document attached hereto as Exhibit 1.

>Answer:  Admit that I signed the Declaration swearing to inventorship.  Deny that I signed anything to assign my rights to the patent application to anyone.

REQUEST NO. 3: Admit that if Overwatch and BioEye never merged, BioEye is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Denied

REQUEST NO. 4: Admit that if the conditions precedent for closing the RTO under the relevant agreement(s) failed to occur, Rision Limited is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Admit that the RTO did not occur.  Deny that Rision Limited is not liable.

REQUEST NO. 5: Admit that if the conditions precedent for closing the RTO under the relevant agreement(s) failed to occur, Barrett is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Admit that the RTO did not occur.  Deny that Barrett is not liable.

REQUEST NO. 6: Admit that if Barrett was not a shareholder or board member of Overwatch or Overwatch/BioEye, Barrett is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Deny.

REQUEST NO. 7: Admit that if the conditions precedent for closing the RTO under the relevant agreement(s) failed to occur, Correia is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Admit that the RTO did not occur.  Deny that Correia is not liable.

REQUEST NO. 8: Admit that if Correia was not a shareholder or board member of Overwatch or Overwatch/BioEye, Correia is not liable for the amounts for which you seek an award through the Complaint.

>Answer:  Deny

REQUEST NO. 9: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that BioEye obtained all required shareholder, board of directors and regulatory approvals.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 10: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited closed on the purchase of all of the issued and outstanding equity securities of Overwatch.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 11: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited satisfied all requirements of, and re-complying with, Chapters 1 and 2 of the ASX Listing Rules.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 12: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited raised at least $7,000,000 pursuant to the terms therein.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 13: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited procured the resignation of each of Rision Limited's then current directors.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 14: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited and BioEye executed a Share Sale Agreement and Definitive Documentation (as set defined therein).

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 15: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that there was no material adverse change in the circumstances of Rision Limited or BioEye prior to the closing.

Answer: Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 16: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited or BioEye completed any necessary or reasonable due diligence.

>Answer:  Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

REQUEST NO. 17: Admit that according to the Term Sheet attached hereto as Exhibit 2, a condition precedent for the closing of the RTO was that Rision Limited or BioEye obtained all necessary third-party consents to the Transactions (as that term is defined therein).

>Answer:  Deny.  I am not a party and am not qualified to determine the legal effect of this agreement.

## VERIFICATION

I, Paul Morinville, believe that the foregoing responses are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Signed: _____
Paul Morinville

Date: Aug 27, 2021