UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| MORINVILLE, PAUL | ) | Case No. 20-cv-00980 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **FILED** |
| v. | ) | |
| | ) | FEB 1 0 2022 |
| OVERWATCH | ) | |
| TECHNOLOGIES, INC. ET | ) | Clerk, U.S. District Court |
| AL., | ) | Eastern District of Texas |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT

I. ATTEMPT TO SECURE COUNSEL:

*Please answer the following concerning your attempt to secure counsel.*

A. *In the preparation of this suit, I have attempted to secure the aid of an attorney as follows: (circle one)*
1. *Employ Counsel*
2. *Court - Appointed Counsel*
3. *Lawyer Referral Service of the State Bar of Texas,*
 *P. O. Box 12487, Austin, Texas 78711.*
B. *List the name(s) and address(es) of the attorney(s):*

Bryan Farney, Georgetown TX
Erick Robinson, Houston, TX
Steve Daniels, Austin, TX
John Nelson, Austin, TX
Allen Gardner, Tyler, TX
David Bennett, Chicago, IL
Jason Wright, Dallas TX
London England, Dallas TX
Ruben Garcia, Dallas TX
Baylor Law School, Brad Tobin, Dean
Southern Methodist University Dedman School of Law, Jennifer M. Collins, Dean
Texas A&M School of Law, Robert Ahdeih, Dean
University of North Texas School of Law, Felicia Epps, Dean

*C. Results of the conference with counsel:*

Attorney fees exceed the value of the case.

II. List previous lawsuits:

*A. Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action or any other incidents? _____Yes \_\_**X**\_\_\_ No*

*B. If your answer to "A" is "yes", describe the lawsuit in the space below. If there is more than one lawsuit, attach a separate piece of paper describing each.*
   *1. Approximate file date of lawsuit:* _____
   *2. Parties to previous lawsuit(s):*
   *Plaintiff* _____
   *Defendant*_____
   *Attach a separate piece of paper for additional plaintiffs or defendants.*
   *3. Identify the court the lawsuit was filed. If federal, name the district. If state, name the county.*

   _____
   *4. Docket number in other court.* _____
   *5. Name of judge to whom the case was assigned.*

   _____
   *6. Disposition: Was the case dismissed, appealed or still pending?*

   _____
   *7. Approximate date of disposition.* _____

III. Parties to this suit:
   A. *List the full name and address of each plaintiff*:
      Pla #1  Paul Morinville
         3902 Sequoia Trail West
         Georgetown, TX 78628
         512-294-9563
         paul@morinville.net


   B. *List the full name of each defendant, their official position, place of employment and full mailing address.*
      Dft #1: Overwatch Technologies, Inc.
         17440 Dallas Parkway
         Suite 230
         Dallas, TX 75287
      Dft #2: BioEye, LTD.
         HaTsedef St 8, Hofit
         Israel
      Dft #3 Rision Limited

2

Level 24/44 St Georges Terrace, Perth WA 6000
Australia
Dft #4 Clive Barrett
c/o Quantum Partners, Level 1, 95-97 Grafton Street Bondi Junction NSW 2022
Australia
Dft #5 Emmanual Correia
c/o Peleton Capital Limited
Level 8/2 Bligh St, Sydney NSW 2000
Australia

IV: Statement of Claim:

*State as briefly as possible the fact of your case. Describe how each defendant is involved. Include the names of other persons involved with dates and places. Do not give any legal arguments or cite cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Use as much space as you need, attaching additional pages if necessary.*

## The Parties

1.      I am Plaintiff Paul Morinville of Georgetown, Texas. I have been involved in technology companies and technology startups since 1993. I worked as an executive at Dell Technologies, and as a chief executive officer and other c-level executive positions in multiple startups. I am the founder and former president of US Inventor, Inc., a lobbying firm in Washington DC that advocates for stronger patent protection for emerging technology companies and on behalf of individual American inventors. I am the sole named inventor on nine issued U.S. patents and more than 20 pending patent applications. I am also the president of SemiComm HK, Ltd., a Hong Kong registered company that licenses its patents to technology companies in China.

2.      Prior to June 2019, Defendant Overwatch Technologies, Inc ("Overwatch") was developing a software application that would run on a smartwatch worn by individuals with epilepsy that detected abnormal movement indicative of an epileptic seizure and sent alerts to a

user's caregivers and emergency contacts (the "Epilepsy App").  This market was well understood by Overwatch's executives, and the product was close to launch.[1]

3.      Prior to June 2019, Terry Fokas (Fokas) was the CEO of Overwatch.

4.      Prior to June 2019, Defendant BioEye LTD ("BioEye") was attempting to develop a product that would identify non-normal differences in eye movement and pupillary light reflect ("PLR") to detect early signs of cognitive degeneration (the "Cognitive Decline App").  The Cognitive Decline App was not commercially viable because a) it was an incomplete product and lacked the majority of required functionality, and b) BioEye lacked a significantly large data set of ocular biomarkers necessary to evaluate and detect early signs of cognitive degeneration.  Collecting this data set would take more than a decade of clinical trials involving several thousand participants, meaning it would take many years and a significant expenditure of investor capital for the Cognitive Decline App to be commercially viable. Unsurprisingly, BioEye had no customers and on information and belief, the investors in BioEye had decided by the summer of 2019 not to continue to fund the company unless BioEye developed different products that could be commercialized sooner and with considerably less capital investment.

5.      Prior to June 2019, Eran Ferri ("Ferri") was the CEO of BioEye.

6.      Defendant Clive Barrett ("Barrett") was a member of BioEye's Board of Directors.

7.      Defendant Emmanuel Correia ("Correia") has had a long personal friendship with Barrett and, through his company Peloton Capital, Ltd. ("Peloton Capital"), also has had a long professional relationship as a financial adviser to Barrett.  On information and belief, Barrett and

---

[1] Defendant Overwatch and I settled all claims in December 2021

Correia have acted in concert multiple times to make investments in the same companies similar to the investments they made in BioEye and Overwatch.

8.      Defendant Rision Limited ("Rision") is a company domiciled in Australia and listed on the Australian Stock Exchange ("ASX").

9.      Overwatch settled with me for all claims in December 2021, thus Barrett, Correia, BioEye and Rision are "the Defendants".

## Factual Allegations

### A.      My Agreement and Engagement

10.      In May 2019, Barrett introduced Ferri to Fokas and shortly thereafter, senior executives for Overwatch and BioEye met in Dallas for meetings to review BioEye's commercialization efforts of the Cognitive Decline App. After these meetings, Barrett urged Fokas to have Overwatch acquire BioEye so that Overwatch could develop new products based on BioEye's ocular tracking technology.

11.      In July 2019, Overwatch and BioEye entered into an agreement for Overwatch to acquire BioEye and to become one entity ("Overwatch/BioEye"). Exhibit 14 is the BioEye minutes of a board meeting conducted on July 23, 2019 authorizing the acquisition.  The agreement had no conditions precedent to consummating this transaction.  In July 2019, Fokas assumed the role of CEO of Overwatch/BioEye and Ferri assumed the role of Chief Operating Officer ("COO") of Overwatch/Bioeye.

12.      Overwatch's acquisition of BioEye was intended to identify new markets for BioEye's ocular biomarker technology so that new products could be brought to market much

sooner, and to facilitate the launch of Overwatch's Epilepsy App by consolidating management, operations, research, sales, marketing, and funding.

13.     Overwatch/BioEye's plan was to then consummate a reverse takeover ("RTO") or merger into Rision in April 2020.  Upon consummation of the RTO, the combined entity would be publicly traded on the Australian Stock Exchange ("ASX") and Rision would change its name to "Overwatch Technologies, Ltd".  The newly renamed Overwatch Technologies, Ltd would then raise investor capital on the ASX with an initial market capitalization of 15 million dollars.

14.      Prior to Overwatch's acquisition of Bioeye, Barrett was a significant shareholder, and member of the Board of Directors of BioEye.  Barrett (through his nominee company) was also a major debt holder in Overwatch.  In addition, Barrett's network of business associates, acquired all of the initial debt issued by Overwatch to fund its operational and development efforts. Correia, through his nominee company, was also a shareholder in BioEye and a debt holder in Overwatch.

15.      After Overwatch's acquisition of BioEye, Correia became Overwatch's investment adviser through his company, Peloton Capital.  Barrett and Correia, through their extensive shareholdings in BioEye and their ownership of a majority of Overwatch's issued debt exercised oversight and direction as well as day-to-day executive management of Overwatch/BioEye operationally and financially including management activities such as hiring, firing, spending, marketing, product features, and vendor selection.  Such day-to-day executive management decisions were passed on by Barrett and Correia to Fokas to execute.

16.     In June 2019, Fokas contacted me to inquire if I would work for Overwatch/BioEye to identify viable markets for the new products that Overwatch/BioEye

needed to develop. This work is generally referred to as product management and product marketing.

17.     In July 2019, Fokas verbally offered me $15,000 in monthly fees and 2% of Rision shares upon completion of the RTO with the title of Product Manager, which was later retitled to Vice-President Product Development of Overwatch/BioEye.  The value of the promised Rision shares was $300,000.

18.     However, Overwatch/BioEye funding commitments to get to the RTO with Rision were limited and I was asked to accept delayed payment of a portion of my monthly fees until the completion of the RTO.  At that time, I would be paid in full for all unpaid fees and awarded the Rision shares.

19.     Relying on the representations made of the merged Overwatch/BioEye entity and the RTO, I agreed with these terms and began my engagement with Overwatch/BioEye in July 2019.

20.     I received $3,000 of the $15,000 monthly fee for the months of July 2019, August 2019, September 2019, October 2019, November 2019 and December 2019.  I received $5,000 of the $15,000 monthly fee for the months of January 2020, and February 2020.  From March 2020 through September 2020, I was paid none of my monthly fees.

21.     On my termination in September 2020, the unpaid portion of my compensation was $197,000 in unpaid monthly fees and $300,000 in unpaid shares in the RTO.

22.     During my engagement with Overwatch/BioEye, I worked exclusively on the new ocular biomarker products that Overwatch/Bioeye was developing but excluding the Epilepsy App.

23.     My duties were consistent with executive level product management and marketing.  I was listed in Overwatch/BioEye company documents, prospectuses seeking funding, and the ASX application as the company's Vice-President Product Development. (see Exhibit 11 page 2, and Exhibit 33 page 9)

24.     During my engagement with Overwatch/BioEye, I identified three markets and developed three products to address these markets), which were drug detection ("Eympair"), concussion detection ("Eympact"), and sepsis detection ("Overwatch IDT"), (collectively, the "Morinville Intellectual Property").

**B.     Morinville Intellectual Property**

25.     When I joined Overwatch/BioEye in July 2019, the Cognitive Decline App was based on freely available open-source software that BioEye converted to deploy as a smartphone app. The software ran on smartphone hardware using an Android operating system and communicated with a server via the internet.  The Cognitive Decline App recorded and processed video and, via machine learning algorithms, extracted and measured ocular biomarkers of eye movement and PLR.  The extracted biomarkers were then sent to a server for storage via the internet.

26.     The Cognitive Decline App ran on a smartphone which had limited processing power; it did not utilize or have backend server application that would have avoided these processing limitations.  In addition, the Cognitive Decline App had no customer facing applications or interfaces, no administrative applications, and insufficient data security in place to produce a product that could be used by customers or other third parties.

27.     In sum, the Cognitive Decline App was simply not a marketable product.  It was merely an idea for a product that needed significant development work and vast amounts of data

to validate the product's attempt to predict future cognitive decline. Unsurprisingly, BioEye had no paying customers (or even non-paying beta customers for that matter) when Overwatch acquired BioEye.

28.     During the May 2019 meeting of Overwatch and BioEye's senior executives, Overwatch-retained consultants had identified that ocular biomarker technology could be useful in the concussion and drug detection markets. These markets are large and diverse with many segments.  For example, the concussion detection market segments into sports, emergency responders, police, hospitals, and more, and the drug detection market segments into schools, sports, trucking, transportation, workplace, and more.  Overwatch/BioEye had not evaluated any of these markets or segments.  They had done no research related to market size, demand, pricing, product features, or anything else for any of these markets or segments.  As a result, Overwatch/BioEye had not determined which market segments to address with a product and because products are designed for a specific market, Overwatch/BioEye also had no concept of what it needed to build in a product.

29.     My first task when I commenced my engagement with Overwatch/BioEye in July 2019 was to research these markets and determine which had the highest potential to launch commercially viable products.  I identified those segments within the drug and concussion detection markets to position two new products.

30.     For each product, I first determined the product features required by the market and then translated those features into product requirements documents necessary for coders to code the product.

31.     There are two sides to Overwatch/Bioeye products: smartphone-based applications and the server-based applications.

9

32.     **Smartphone-based Applications.** Each product required its own set of tests (Horizontal Gaze Nystagmus (HGN), PLR, etc.).  Each test type required its own variables (length of test, lighting conditions, timing, etc.).  Each test required its own customer data input (user, test identification, etc.)

33.     For each product, I developed the smartphone application defining the user interfaces, test types and customer data input, which included, but was not limited to, developing product requirements, page flow diagrams, use cases, mockups, and test plans.

34.     **Server-based Applications.**  Each product sends data from the smartphone to the server.  This data needed to be made available to users, customer and Overwatch/BioEye administrators.  I first drove the development of applications on the server for Eympair.  I was aware that the Overwatch/BioEye system could provide value to multiple markets each with their own product, so I drove the development to create a system that could be quickly and easily be repurposed for other markets.

35.     I drove the development of backend server applications to store video, biomarkers, and other data for customer and internal administration facing systems which included, but was not limited to, developing product requirements, wireframes, page flow diagrams, use cases, mockups, normalized database models, processing models, and test plans (see Exhibit 19).

36.     Based on my market research, I drove development and requirements of infrared cameras and lights for low light applications, and I defined device requirements for an add-on infrared camera and light.

37.     The back-end server application I developed for Eympair was universal in its structure so that it could be quickly changed to accommodate the needs of multiple products.  I

used this Eympair structure to accommodate customer requirements of Eympact making the necessary changes to the page flow and data management for the new tests, data and customer requirements.  (Exhibit 20 for Eympact)

38.     For Eympact, I additionally developed the requirements to map Eympact eye movement testing to a tablet computer to enable testing on the sidelines during sporting events.

39.     In April 2020, I researched how disease affects PLR and found that PLR readings change with the onset of sepsis which is an overreaction of the body's inflammatory response system and the leading cause of death of COVID-19 patients.  Based on my research and after consulting with medical experts, I determined that ocular biomarker tracking technology could be used to identify the early onset of sepsis in COVID-19 patients, which would allow medical personnel to remotely monitor the progression of sepsis in COVID-19 patients.  I again used the Eympair structure to accommodate customer requirements for a product addressing this market making the necessary changes to the page flow and data management to accommodate new tests, data and customer requirements.  The product was named Overwatch IDT.

40.     **Frame Skipping.**  Due to smartphone processor limitations and the Android operating system's prioritization of processes moving through the processor, a video frame was captured for processing to extract biomarkers every 4 seconds on average, but the intervening frames were skipped and not processed ("Frame Skipping").  Because skipped frames were not processed to extract biomarkers, Frame Skipping created a four second gap in biomarker data between the captured frames, which meant that the set of extracted biomarkers was incomplete and therefore the results were inaccurate and unusable. Frame Skipping made any product built on the BioEye software unmarketable.

41.     I identified that Frame Skipping was a serious problem and drove development in Israel and the United States no longer process video and extract ocular biomarkers on the smartphone and to instead move it to more powerful processing on a server.  This development effort ensured that all frames would be captured for biomarker extraction, which was necessary to solve the Frame Skipping problem.

42.     **Documentation**.  In addition, for each of the products, I developed sales documentation, marketing documentation, training documentation, customer documentation, product support documentation, financial models, sales models, and more. (see Exhibit 21 for Eympact)

43.     **Eympair Testing with Mesquite Police.**  In July 2019, I held meetings with the senior drug recognition expert of the Mesquite, Texas police department to discuss Mesquite police field-testing the Eympair drug detection product.  As a result of these meetings, the Mesquite police department agreed to work with Overwatch/BioEye to field-test Eympair and to set up drug detection policies and procedures for Eympair in accordance with the standardized drug recognition expert (DRE) protocols promulgated by the International Association of Chiefs of Police.  I worked extensively with DRE officers from the Mesquite Police Department to develop and refine the testing protocols to be used with Eympair and I incorporated feedback from the Mesquite Police Department into Eympair.  I also tested Eympair during a Mesquite Police Department Academy Training session for alcohol intoxication detection training.

44.     In March 2020, with field testing completed with the Mesquite Police Department, discussions were commenced with the Dallas, Texas police department and the Texas Rangers for these law enforcement organizations to beta-test Eympair.

45.     In March 2020, the Defendants were in communications related to Eympact with the Australian Football League ("AFL") (see Exhibit 30, page 3)

46.     In March 2020, due to the Covid-19 pandemic, I was informed that the RTO would be delayed until August 2020.  I was also informed that funding the operations of Overwatch/BioEye had not been planned for this delay.  This meant that there was not enough cash to pay my monthly fee.  Fokas asked me (and I agreed) to continue work without my monthly fee until the RTO in August 2020 at which time I would be paid in full for all unpaid fees and be awarded the previously agreed upon 2% of Rision.  On information and belief, Barrett and Correia were informed by Fokas that I had agreed to defer my monthly fees pending the completion of the RTO.

47.     In May 2020, I drafted Overwatch's applications for multiple government grants and programs to fund the development of Overwatch IDT.  I drafted the extensive documentation for emergency use authorization by the Food and Drug Administration ("FDA") so that Overwatch IDT could obtain FDA approval for use as an early warning sepsis detection product (see Exhibit 22).  Dovi Yellen contributed technical information to this application (see Exhibit 23).

48.     I also applied for University of Kentucky COVID-19 research grants, (see Exhibit 26) National Institute of Health RADx grants (see Exhibits 40 and 27), Department of Homeland Security grants (see Exhibit 29), and Indiana state grants (see Exhibit 28).

49.     By May 2020, Overwatch/BioEye partnered with doctors at Cosenza Hospital in Italy to test Overwatch IDT during the pandemic (see Exhibit 24).

50.     In May 2020, Barrett and Correia directed Fokas to concentrate all Overwatch/BioEye's efforts to spend the necessary funding to develop an Eympact sideline

concussion testing device for the AFL.  I was asked to work exclusively on this Eympact device

to finalize product development for sideline concussion testing for the AFL.  I defined product

requirements researching AFL league regulations for concussion, medical protocols, and

competitive products.  I reviewed device development requirements for usability in relation to

product and customer requirements and assisted development with two different design teams in

Israel to develop a prototype device.

51.    The intellectual property that I developed includes all of the foregoing

technologies, implementations and enhancements (and related documentation) discussed above

for Eympact, Eympair and Overwatch IDT (collectively, the Morinville Intellectual Property),

the backend applications supporting customers and administration, and a patent application that

was filed with the United States Patent and Trademark Office which sets forth various claims of

inventions related to these products:

> Title: ENHANCED OCULOMOTOR TESTING DEVICE AND METHOD USING
> AN ADD-ON STRUCTURE FOR A MOBILE DEVICE
> Application No.: 16/724,356
> Filing Date: December 22, 2019
> Inventors: Paul Morinville; Dovi Yellin

52.    I did not assign my rights to Overwatch/BioEye, or Overwatch, or BioEye for any

of the Morinville Intellectual Property, including the above stated patent application.

53.    In September 2020, Overwatch commissioned a valuation of Eympact and

Eympair products. The valuation was performed under a variety of financial modeling

methodologies and determined an average valuation for Empact of 12 million dollars and an

average valuation for Eympair of 15 million dollars. Therefore, the products that I developed or

that incorporate the Morinville Intellectual Property are valued at approximately 39 million

dollars. Eympact's valuation was performed without knowledge of the AFL contract, making it almost certain that Eympact's valuation is much higher now.

**C.      The Defendant's Secret AFL Agreement**

54.      In May 2020, Barrett and Correia directed Fokas to concentrate all Overwatch/BioEye's efforts and funding to develop Eympact to perform sideline concussion testing for the AFL.  I was asked to work exclusively on Eympact to finalize product development for sideline concussion testing for the AFL.

55.      By June 2020, the Defendants were secretly negotiating a contract for Eympact between the AFL and Bioeye alone.  Exhibit 2 is Correia's discovery document number ID DOC 437. ("Correia Call Notes") On page 4 of the Correia Call Notes are the notes taken by Correia during a call on June 11, 2020 (several months prior to my termination in September 2020). Correia writes "AFL paperwork" next to the name "Rosich" and highlights it in yellow. The name "Rosich" refers to Steve Rosich, a former AFL executive and Chairman of the Board of Directors of Rision and the point person for discussions with the AFL.

56.      Although the documents referred to by "AFL paperwork" were *withheld from discovery by the Defendants,* "AFL paperwork" likely refers to a contract at some stage of negotiations taking place between BioEye and the AFL at the very same time that Barrett had instructed Fokas to concentrate all Overwatch/BioEye efforts, including me, on Eympact.

57.      Exhibit 1 is a September 3, 2020 email exchange between Barrett and Fokas recalling the events that brought Overwatch/BioEye to financial crisis ("September Email"). *The Defendants disclosed a cropped version of this email* (see Exhibit 34).  Tellingly, Fokas states "we hadn't been in touch with the AFL since March" 2020.  In other words, Fokas who was the

CEO of Overwatch/BioEye had no idea in September 2020 that there were discussions on-going between Barrett and Correia and the AFL in June 2020.  From Page 2 of the September Email:

You blew a $100,000 hole in that funding with your demand in May that we have an Eympact product ready by July 31st (notwithstanding that the AFL had not even resumed its season by that time and that we hadn't been in touch with the AFL since March)   I remember how furious you got with me when you found out from Gadi that I said that a device was not required by July 31st as long as we were able to announce a research collaboration agreement in July and your insistence that we have a product sideline ready.  The reason why we're in this predicament is because of your misguided decision that the company spend its bridge funding to the RTO for development of a product that wasn't even required by the AFL this season.

58.     Moreover, in October 2020, only weeks after I was terminated and the RTO was unilaterally scuttled by the Defendants, Barrett phoned me and inquired if I would go to Australia to work on the field with AFL personnel using the sideline concussion detection product (formerly called Eympact and now aptly renamed EyeCon by BioEye) during the preseason which was starting in November 2020.  Clearly, an agreement to perform sideline concussion testing with the AFL, a major professional sports league, would have meant that BioEye and the AFL had been negotiating and documenting an agreement for several months prior to the commencement of the AFL pre-season in November 2020.  Also in this conversation, Barrett told me that BioEye was still working with Cosenza Hospital, which I had previously been informed had ended by Barrett and Yellen.

59.     The contract between BioEye and the AFL is key to understanding the motivation underlying the Barrett and Correia's actions designed to prevent the RTO from taking place. Prior to BioEye's merger with Overwatch, BioEye had no revenues, customers, or viable commercial products.  However, because of the Morinville Intellectual Property, which included the creation of Eympact as a sideline concussion detection product for high impact sporting events, BioEye was able to enter into an agreement with the AFL to test Eympact during the

2021 season[2] thereby creating a pathway to market Eympact to a high-profile customer which would significantly increase the value of BioEye.  On information and belief, the Defendants were in secret discussions with the AFL as early as June 2020 to consummate this agreement with the AFL to test and ultimately use Eympact.  This agreement with the AFL provided ample motivation for the Defendants to ensure the RTO (which would have included Overwatch, and which would have significantly reduced the amount of equity that would have inured to the Barrett, Correia, and BioEye's other shareholders if they had to share the proceeds of the RTO with Overwatch's shareholders and investors, and me) did NOT take place so that they could realize the entire value of Eympact.

60.    BioEye's agreement with the AFL would not have been possible but for the Morinville Intellectual Property which resulted in the Eympact product.

61.    Evidence of a contract between BioEye and the AFL is also presented in an article from the Guardian dated 3/12/2021 and titled "AFL to use eye technology and 'smart' mouthguards in new concussion studies".[3]  (See Exhibit 3).  Also, a Monash University assessment of BioEye technology used on the AFL[4] (See Exhibit 4) shows that BioEye had executed a contract with the AFL and with Monash University to study the results of the BioEye testing on the field.  In addition, BioEye's own website shows that they entered into a contract with the AFL.[5]  (See Exhibit 5).

---

[2] "Talk of a concussion substitute comes as the AFL wrote to clubs encouraging them to be involved in two major concussion-related projects that will be undertaken across the 2021 season. The first project, BioEye, is an eye-tracking technology that has the potential to aid in the management of concussion in AFL players by providing an objective set of data to supplement the current subjective data/information used by medical teams.
Source: https://pressfrom.info/au/news/sport/-354167-afl-considering-radical-concussion-rule-change.html  (accessed November 29, 2021)

[3] https://www.theguardian.com/sport/2021/mar/12/afl-to-use-eye-technology-and-smart-mouthguards-in-new-concussion-studies
[4] https://research.monash.edu/en/projects/assessment-of-bioeye-eye-tracking-technology-in-the-management-of
[5] https://www.bioeye.com/research/

62.      The Defendants claim on page 11, item 56 of the *Joint Motion of Clive Barrett,*

*Emmanuel Correia and Rision Limited* filed December 3, 2021, that the reason the RTO was

never consummated was based solely on the ASX's August 2020 denial of the

Overwatch/BioEye listing application due to "[(a)] the early stay of Overwatch's proposed

business operations and the limited history of the proposed business available to the ASX; [(b)]

the very early stage of BioEye's proposed business operations and unproven business model,

including the fact that Eympair and Eympact have not yet been commercialised;".  However, a

completed (or pending) agreement between Overwatch/BioEye and a national sports league like

the AFL a material event which would have materially altered the ASX's conclusion that

Eympair and Eympact were not yet ready for commercialization and would have been a

significant factor for the ASX to consider in deciding whether to approve the Overwatch/BioEye

RTO.

63.      The fact that the Defendants *failed to disclose the existence of the agreement* with

the AFL particularly during the crucial period when the ASX was reviewing the

Overwatch/BioEye application for listing can only mean that the Defendants had decided to

purposefully scuttle the Overwatch RTO.

64.      Stated another way, the agreement with the AFL provided ample motivation for

the Defendants to ensure the RTO did *NOT* take place so that BioEye alone could RTO with

Rision and exclude Overwatch's shareholders and investors, and me.

**D.      The Merged Entity, Overwatch/Bioeye**

65.      In July 2019, Overwatch and BioEye entered a term sheet for Overwatch to

acquire BioEye and to create the Overwatch/BioEye entity (see Exhibit 6, *which was not*

*disclosed be the Defendants*).  This transaction had no conditions precedent related to the RTO

with Rision and was approved by the Board of Directors of both Overwatch and BioEye as stated

by Ferri to Fokas: "Absolutely correct. BioEye board is in full agreement (with Clive recusing

himself from the vote) to move forward with the transaction." (see Exhibit 7: the "Eran-Fokas

July 2019 Email*" which was not disclosed by the Defendants*). (also see Exhibit 14: Bioeye

board minutes of July 23, 2019). On information and belief, this transaction is documented in

multiple agreements and communications, *none of which were disclosed by the Defendants*.

66.     Exhibit 38 is the Overwatch Digital Health Executive Business Summary dated

December 12, 2019, *which was not disclosed by the Defendants*.  It states in the Overview:

"Overwatch Digital Health, Inc. and its wholly owned subsidiary, BioEye, Ltd…"  Also, Ferri is

listed as its chief operating officer.  This document was written, reviewed, commented on, and

authorized by the Defendants.

### OVERVIEW

Overwatch Digital Health, Inc. and its wholly owned subsidiary, BioEye, Ltd. (collectively, "Overwatch") are application software companies that have developed unique, cutting edge proprietary technologies in three different markets/product lines: epilepsy seizure monitoring and alerting (*Overwatch App*); roadside detection of drug use (*Eympair*); sideline testing for concussive brain injury (*Eympact*).

67.     Exhibit 8 is a letter to Overwatch/BioEye Convertible Note and Promissory Note

Holders seeking further investment.  This letter was written, reviewed, and authorized by the

Defendants and was intended for Fokas to distribute to current Overwatch/BioEye investors and

to the investing public.  On information and belief, the Defendants were informed by Fokas that I

had received a copy of this letter so that I could assist Overwatch/BioEye in obtaining additional

investments.  Exhibit 8 clearly notes that Overwatch had acquired BioEye and merged into the

Overwatch/BioEye entity.  From page 1 of Exhibit 8:

### Overwatch Funding

Since its inception in February 2019, Overwatch has raised approximately US $___ million through sales of convertible and promissory notes.  The intended use of these funds was to build out our epilepsy monitoring and alerting application (the "Overwatch App") and to implement machine learning and artificial intelligence training algorithms to enhance accuracy.  In addition, these funds were to be used to pay development costs for the Eympact App (concussion detection application) and the Eympair App (drug-detection application) which are based on technology created by BioEye, Ltd. (as noted in my previous correspondence, Overwatch entered into an agreement in September 2019 to acquire Israel-based BioEye).

68.     Exhibit 9 is pages 1-3 of an investor presentation entitled "Rision, Ltd - Overwatch/BioEye Corporate Presentation" ("Overwatch/BioEye Corporate Presentation"), which was also written, reviewed, and authorized by the Defendants, and used in distribution to the investing public to attract investment into Overwatch/BioEye.  On information and belief, the Defendants were informed by Fokas that I had received a copy of the Overwatch/BioEye Corporate Presentation so that I could assist Overwatch/BioEye in obtaining additional investments.

69.     Exhibit 10 is page 24 of the Overwatch/BioEye Corporate Presentation.  Exhibit 10 shows that Fokas, Steve Rosich, the Chairman of the Board at Rision, Barrett, and Correia have all become members of the Overwatch/BioEye Board of Directors.

70.     Exhibit 11 is pages 25-26 of the Overwatch/BioEye Corporate Presentation. Exhibit 11 shows the Overwatch/BioEye Management Team comprised Fokas as the CEO (formerly the CEO of Overwatch); Ferri as the President (formerly the CEO of the BioEye); Dovi Yellen as Chief Scientist (Formerly the Chief Scientist of the BioEye); and me as Vice-President Product Development.

71.     Exhibit 37, *which was not disclosed by the Defendants*, is a draft version of the Overwatch/BioEye Corporate Presentation dated October 25, 2019, which shows in a timeline on

page 16 that Overwatch acquired BioEye and which I was asked to edit on October 27, 2019 (Exhibit 36).

72.     Exhibit 12, *which was not disclosed by the Defendants*, shows an organizational chart of Overwatch/BioEye in January 2020 determining the chain of command of Overwatch/BioEye and the organizational matrixed relationships supporting Eympact, Eympair, Epilepsy App and Cognitive Decline App ("Combined Products").  I participated in creating this organizational chart starting in December 2019 (see Exhibit 35). The organizational chart shows Fokas as the CEO of Overwatch/BioEye.  Ferri, as the Interim Chief Operating Officer of Overwatch/BioEye (reporting to Fokas).  Product development is a single unit split by function to support the Combined Products, locating Engineering in the US, and Innovation and Research in Israel.  For example, Dovi Yellen in Israel provided machine learning (ML) and artificial intelligence (AI) engineering for the Epilepsy App.  Marketing and Operations also support the Combined Products.  Chris Czura supported the Combined Products in clinical trials.  These reporting and organizational relationships are the foundation of how a company is managed. Nothing in these relationships show any division of the BioEye and Overwatch entities.  In fact, they show the opposite, that the BioEye and Overwatch were indeed merged into a single unitary entity.

73.     Exhibit 13 is the Overwatch/Bioeye Application for In-Principle Advice (ASX Listing Rules 1.1 condition 1 and 1.19), dated January 31, 2020, which is the application that was filed with the ASX. On page 11 it states: "***As a result of its acquisition of BioEye,*** Overwatch also conducts business in Tel Aviv, Israel where additional engineering resources and research and development are located" (emphasis added).  It defies credibility for the Defendants to have been party to a document filed with the organization that operates Australia's public

markets that states that Overwatch had completed its acquisition of BioEye for those very same Defendants to now claim that no such transaction ever occurred.  The following is clipped from Exhibit 13:

| | |
|---|---|
| Where are the entity's main business activity or activities conducted?[12] | Overwatch's current business activities are solely within the United States.  Overwatch's main office in Dallas, Texas is where the company's U.S. engineering team, sales and marketing and executive officers are located.  As a result of its acquisition of BioEye, Overwatch also conducts business activities in Tel Aviv, Israel where additional engineering resources and research and development efforts are located. |

74.    Even more telling, I was instructed to file an emergency use authorization application with the Food and Drug Administration ("FDA")[6] so that Overwatch could obtain FDA emergency use authorization for the use of Overwatch IDT as an early warning sepsis detection product (see Exhibit 22, *which was not disclosed by the Defendants*).   I was also instructed to file University of Kentucky COVID-19 research grants, (see Exhibit 26); National Institute of Health RADx grants (see Exhibit 27); Department of Homeland Security grants (see Exhibit 29); and Indiana state grants (see Exhibit 28). [7]

75.    In February 2020, I was asked by Fokas to travel to Tel Aviv, Israel to meet with members of the Overwatch/BioEye team and to participate in meetings regarding Eympact and Eympair.  These meetings included in-depth discussions and planning regarding product development, intellectual property protection, sales distribution channels, marketing efforts and staffing.  I made multiple presentations to the Overwatch/BioEye team during these meetings regarding Eympair and Eympact markets, products, and the state of development.  During these

---

[6] The emergency use authorization application was filed with the FDA solely by Overwatch; further proof that Overwatch and BioEye had merged into one single entity.

[7] These applications were filed solely by Overwatch.  On information and belief, the Defendants were aware that the FDA emergency use authorization application, the RADx application, and the other applications were made solely by Overwatch.  It defies belief that Defendants were aware that Overwatch was making representations to the FDA and to various academic and regulatory authorities that it owned Overwatch IDT when that product was really owned by BioEye (as Defendants now claim).

meetings and at an all-hands dinner that Barrett hosted, Barrett repeatedly took the position that Overwatch/BioEye was one unified entity and he confirmed to me that the goal of the combined company was to complete the RTO then scheduled for April 2020.

76.     Exhibit 15 ("Defendant's Cropped Email") is a reply email from Fokas to Correia and Barrett on May 4, 2020 disclosed by the Defendants.  At the bottom of the Defendant's Cropped Email is the header of the initiating email in which Fokas is replying sent by Correia to Fokas and Barrett, *but the Defendants deleted the contents of that initiating email before disclosing it*.  Exhibit 16 ("Uncropped Email") is the full email with the portion that the Defendants cropped included.  The Defendants cropped the full email in which Correia noted that "I have put together a simple spreadsheet for the next 3-4 months…" and the spreadsheet that Correia attached. (see Exhibit 17 ("Correia's Overwatch Budget")).  Correia's Overwatch Budget is titled "Overwatch Digital Health Operating Cashflow May 20 to August 2020" and is a three-month financial budget for Overwatch/BioEye for the months of May 2020 to August 2020.  Correia's Overwatch Budget lists former Bioeye employees, Dovi Yellen and Rotem Tzuk as "Outflows" of Overwatch.

**Outflows**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Terry Fokas | $ | 15,000 | $ | 15,000 | $ | 15,000 | $ | 15,000 | |
| Liz Bowers? | $ | 10,000 | $ | 10,000 | $ | 10,000 | $ | 10,000 | Do we need to re-employ |
| S Fokas | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 5,000 | |
| James Macklin | $ | 4,000 | $ | 4,000 | $ | 4,000 | $ | 4,000 | |
| Christine Nicodem | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 5,000 | |
| Chris Czura | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 5,000 | |
| Waquas Ali Software Engineer | $ | 5,000 | $ | 5,000 | $ | 5,000 | $ | 5,000 | |
| Dovi Yellem | $ | 7,500 | $ | 7,500 | $ | 7,500 | $ | 7,500 | |
| Rotem Tzuk | $ | 7,500 | $ | 7,500 | $ | 7,500 | $ | 7,500 | |

77.     It appears that *Defendants cropped this email because it inconveniently shows that Correia created a budget for a single unified company* and not two separate entities as Defendants now allege.

78.     The September Email (Exhibit 1) includes *the part that the Defendants cropped*

from Exhibit 34.  In the part that the Defendants cropped from Exhibit 34, Barrett unilaterally

decides to change the leadership of Overwatch/Bioeye. "To this point your skill set has not been

utilised properly. You have some wonderful skills but not as a CEO. Yes the company has

enormous potential but if it were to survive and prosper going forward, your role would need to

change." If Overwatch had not acquired BioEye, Barrett would have remained on the BioEye

Board of Directors with no authority to fire Fokas as the CEO of Overwatch.  However, Barrett

did fire Fokas which shows that he believed Overwatch had acquired BioEye and as a result, he

had the authority to fire Fokas presumably through his position as a member of the

Overwatch/BioEye Board of Directors.  Barrett now denies that he was a director of

Overwatch/BioEye and claims that he was a simply a lender in Overwatch.  To the best of my

knowledge, mere lenders don't have the power, authorization, or ability to fire a company's chief

executive officer.  The September Email also shows that Barrett assumed responsibility to the

day-to-day executive management of Overwatch/Bioeye.

79.     To summarize, Exhibit 6 is a term sheet for Overwatch to acquire Bioeye with no

conditions precedent.  Exhibit 7 shows that the BioEye Board of Directors approved the

acquisition.  Exhibit 14 is the Bioeye board minutes of July 23, 2019 approving BioEye to be

acquired by Overwatch.  Exhibit 38 is the Overwatch Digital Health Executive Business

Summary stating: "Overwatch Digital Health, Inc. and its wholly owned subsidiary, BioEye,

Ltd…"  Exhibit 8 shows that the merged Overwatch/BioEye entity received investment in the

form of convertible and promissory notes issued to investors, and explicitly states that

Overwatch acquired BioEye in September of 2019. Exhibit 9 shows that the Defendants

marketed the merged Overwatch/BioEye to current investors and to the investing public to attract

investment.  Exhibit 10 shows that the BioEye's Board of Directors became members of Overwatch/BioEye's Board of Directors. Exhibit 11 shows that the management teams of the BioEye and Overwatch had merged into the Overwatch/BioEye entity.  Exhibit 37 is a draft version of the Overwatch/BioEye Corporate Presentation dated October 25, 2019, which shows in a timeline on page 16 that Overwatch acquired BioEye.  Exhibit 12, *which was not disclosed by the Defendants*, shows that the organizational chart of the merged Overwatch/BioEye entity. Exhibit 13 shows the Defendants represented to the ASX that Overwatch had acquired BioEye in the listing application for the RTO.  Exhibits 22, 26, 27, 28 and 29 are grant and emergency use applications filed by Overwatch to federal and state governments and private sector entities. Exhibit 16 ("Uncropped Email") shows Correia wrote the budget for Overwatch/BioEye. Exhibit 1 shows that Barrett acted in his role as a member of the board of directors of Overwatch/BioEye to fire Fokas.

80.     The foregoing Exhibits were either written or were reviewed, commented upon and authorized by the Defendants, and directly contradict the Defendants assertion that there never was a merged entity, and *many were withheld by the Defendants*.  If the merger did not take place, as the Barrett, Correia, BioEye, and Rision adamantly assert in multiple filings with this court, the Defendants have attempted to perpetrate a fraud not only on Overwatch/BioEye's existing investors and to the investing public but also to the ASX.

81.     In addition, I was informed by Fokas that Barrett and Correia were told that I had been asked to approach investors who I knew, and with whom I have done business in the past, using the Overwatch/BioEye Corporate Presentation in an attempt to raise capital for Overwatch/BioEye.  Thus, if Overwatch/BioEye did not exist, the Defendants duped me into

unwittingly participating in their fraud, levying potentially fatal damage to my reputation and career, while exposing me to potential criminal prosecution.

82.     The totality of the evidence showing that Overwatch acquired BioEye in July 2019 with no conditions precedent to the acquisition and that Overwatch/BioEye was operating as a single unified entity until September 2020 is overwhelming. Yet, boldly, the Defendants tell this Court that it is all fiction *while withholding critical documents and emails from discovery*.

**E.     The Defendant's Unilateral Break Up of Overwatch/Bioeye to Scuttle the RTO**

83.     The September Email chronicles the events that brought Overwatch/BioEye to financial crisis.  In it, Fokas describes $300,000 in funding raised by Overwatch/BioEye in April 2020 from multiple investors, some in the United States, intended to bridge Overwatch/BioEye to the August RTO ("Bridge Funding"). From the Page 2 of the September Email:

You and Manny told me to shut down the company back in March because there was no interest in funding this entity.  Instead of following your advice and allowing the investors (yourself included) lose their entire investment, I got Joel Bines to make a personal loan to me of $50,000 so we could launch the Overwatch App and keep the company operational until the capital markets stabilized.  I then got another $100,000 investment (and you got Moss to contribute $200,000) for Overwatch in April so we could fund the company to an RTO in August.

84.     The next paragraph shows that Barrett "blew a $100,000 hole" in the Bridge Funding by demanding that Overwatch/BioEye direct all its efforts to complete Eympact for the AFL by July 31, 2020.

You blew a $100,000 hole in that funding with your demand in May that we have an Eympact product ready by July 31st (notwithstanding that the AFL had not even resumed its season by that time and that we hadn't been in touch with the AFL since March)  I remember how furious you got with me when you found out from Gadi that I said that a device was not required by July 31st as long as we were able to announce a research collaboration agreement in July and your insistence that we have a product sideline ready.  The reason why we're in this predicament is because of your misguided decision that the company spend its bridge funding to the RTO for development of a product that wasn't even required by the AFL this season.

85.     Barrett's redirection of funds for development of an Eympact sideline device wasted a substantial amount of Overwatch/BioEye's very limited resources, which were intended

to financially bridge Overwatch/BioEye to the anticipated August RTO and effectively starved Overwatch/BioEye of the funding it needed to make it to the August RTO.

86.     Barrett's redirection of over a third of Overwatch/BioEye funding toward development of Eympact for the AFL makes sense in light of Correia's Call Notes in June 2020 referencing "AFL paperwork" and supports the allegation that a contract between BioEye and the AFL was at some stages of negotiations, possibly completed.  The existence of an agreement with the AFL, *which should have been disclosed by the Defendants but wasn't*, would have been a material development for the company because it would have likely overcome ASX's concerns about the stage of Overwatch/BioEye's commercialization efforts, and which ultimately lead to the ASX rejecting Overwatch/BioEye's application for listing.

87.     Even after Barrett "blew a $100,000 hole" in Overwatch/BioEye's funding in May 2020, Barrett and Correia refused all new funding that Fokas had secured from US investors.  This new funding would have not only enabled Overwatch/Bioeye to survive until planned August RTO, but it would also have positioned Overwatch/BioEye to continue operations for the foreseeable future in the event the RTO failed.  From Page 2 of the September Email:

I told you and Manny in July that I could raise $200,000 from Joel Bines and some other US investors to continue operations but you didn't like the terms and so Manny suggested we wait for ASX approval to close that round on better terms.  We didn't get ASX approval so that funding wasn't consummated.  Because of that I had to personally pay employee salaries for July and I'm personally liable for employee salaries for August.

88.     In August 2020, the Defendants were aware that Overwatch/BioEye had become financially insolvent, but Barrett and Correia refused to even discuss funding options with Fokas. Indeed, Barrett even canceled a scheduled call with Fokas to discuss funding and told Fokas they

had no interest in discussing funding. From Page 2 of the September Email from Fokas to

Barrett:

> I emailed you and Manny weeks ago that I no longer had any money to keep paying salaries and I wasn't willing to take personal responsibility for employee salaries in September.  Instead of working with me to figure out how we could address this funding shortfall, last week you cancelled the call the three of us were supposed to have and instead sent an email that you had no further interest in funding the company.  I haven't heard from you since.

89.     Overwatch entered into an agreement to acquire BioEye in July 2019.  Since that

time, the two companies have functioned as a single unitary entity.  There are no documents or

agreements between Overwatch and BioEye that show otherwise.  Nor has Overwatch/BioEye,

Overwatch or BioEye produced any board resolutions that would show that the companies

somehow unmerged and become separate entities.

90.     Had the Barrett and Correia not secretly negotiated the AFL contract and had,

instead, disclosed to the ASX that there was an agreement in place (or discussions to soon enter

into an agreement) with the AFL, it is almost certain that the ASX's rejection of the

Overwatch/BioEye listing application would not have occurred.

91.     Instead, Barrett and Correia chose to not disclose the completed (or pending)

agreement with the AFX and that negatively impacted the ASX's decision and directly lead to

the failure of Overwatch/BioEye RTO which allowed Barrett and Correia to break up

Overwatch/Bioeye by refusing to continue funding the company and by refusing to allow Fokas

to raise funding from other sources.

92.     Once Overwatch/Bioeye was broken up, BioEye took possession and control of

the Morinville Intellectual Property, which is necessary to fulfill the AFL contract so that BioEye

and its shareholders could recognize the full value that the Morinville Intellectual Property and

keep it for themselves.

**F.      The Defendant's Claim that Overwatch/BioEye Never Existed**

93.      In virtually every filing with this Court, the Defendants assert that BioEye did not merge with Overwatch and that the Overwatch/BioEye entity is fiction.  As shown above, that assertion contradicts the plain black and white letters of the documentation that the Defendants created, commented on, authorized, and distributed to investors, potential investors, and others about the Overwatch/BioEye entity.

94.      As recently as December 3, 2021, in the *Joint Motion of Clive Barrett, Emmanuel Correia and Rision Limited* filed December 3, 2021 on page 8, at C, 35, the Defendants offer by way of proof that the entities never merged by noting that Overwatch and BioEye maintained separate legal identities.  Page 8 of the Motion:

> 35.      Overwatch and BioEye maintained their separate legal identities at all times from July 1, 2019, through September 30, 2020. (Ferri Decl. ¶ 9, Ex. C; Correia Decl. ¶¶ 12-14, Ex. I; Plaintiff's Response to Joint Defendant's 12(c) Motion at p. 7).

95.      As shown above, that offer of proof is directly contradicted by the very documentation that Overwatch/BioEye (through its Board of Directors, officers, and management) created, authorized, commented on, and distributed to existing investors and to the investing public, Australian regulators on the ASX, and others that describe Overwatch/BioEye as a single, unified entity, including Exhibits 1, 6, and 7, *documents that the Defendants withheld from discovery*.

96.      The Defendant's falsely claim that Overwatch/BioEye never existed in order to absolve themselves of paying me the money and the shares in Rision owed to me and for stealing the Morinville Intellectual Property by asserting that my agreement was with Overwatch, not

BioEye, notwithstanding the fact that the Defendants unilaterally scuttled the RTO and that BioEye is in exclusive possession and control of the Morinville Intellectual Property.

97.     Tellingly, while there exists evidence that BioEye's board of directors approved Overwatch's acquisition of BioEye (see Exhibit 7), Defendants failed to provide (because none exists) in any evidence (in discovery, declarations or anywhere else) in the form of board votes or resolutions that either Overwatch or BioEye authorized the dissolution of the Overwatch/BioEye merger.  Nor was any evidence provided that the board of directors of Overwatch or BioEye approved the termination of a major corporate transaction that was the proposed RTO with Rision.

**G.  BioEye Now Profits by Fraudulently Obtaining the Morinville Intellectual Property**

98.     It is reasonable to assume that the Defendants at some point will consummate an RTO with BioEye alone on the ASX.

99.     BioEye continues to pursue the very markets that I had identified with the very products I had developed using the Morinville Intellectual Property.  (see Exhibit 31)

100.    BioEye has contracted with the AFL to provide concussion testing.  This product was named Eympact and is now aptly renamed EyeCon by Bioeye. EyeCon is based on the Morinville Intellectual Property.

101.    BioEye has either restarted, or had never stopped, testing Overwatch IDT with Cosenza Hospital in Italy.

102.    Based on a phone call between Ferri and me in October 2020, BioEye had contacted Motorola at that time to sell the law enforcement drug identification system, called Eympair, in the United States market.

103.    BioEye continues to prosecute the patent application in which I am a named inventor, and which was not assigned by me to BioEye.

## Statement of Claims

104.    **Summary**: The Defendants have committed fraud, breach of contract, and unjust enrichment (also under the theory of quantum meruit) in their efforts to break up Overwatch/BioEye which resulted in scuttling the RTO.  Each of these claims has significantly damaged me with the loss of my monthly fees, the loss of my shares in the post RTO entity, the loss of the Morinville Intellectual Property and losses of my research, documents, time, ideas, reputation, and more.

105.    The Defendants and their lawyers have *failed to disclose key documents and cropped inconvenient information from others* in a deliberate effort to hide the existence of Overwatch's acquisition of BioEye; evidence that the Defendants acted as management of Overwatch/BioEye; the secret contract between BioEye and the AFL; and more so they can continue their claim that Overwatch/BioEye never existed and hide the AFL contract which is the Defendant's primary reason for breaking up Overwatch/BioEye thus enabling the Defendants to abscond with all the value that the Morinville Intellectual Property generated and keep it for themselves.  The Court should compel full and complete discovery from the Defendants.

## Claim 1

### Unjust Enrichment

106.    The Factual Allegations above are incorporated in this Claim as is if they are rewritten here.

31

107.     The Defendants are unjustly enriched with the Morinville Intellectual Property which I developed, which the Defendants received and are benefiting from to fulfill the contract with the AFL to my detriment due to the unenforceability of our formal agreement.

108.     In July 2019, Overwatch/BioEye agreed to compensate me with monthly fees of $15,000 and 2% of the shares in the post RTO Rision in exchange for product marketing and management work that I perform for Overwatch/BioEye.  I agreed to perform this work for Overwatch/BioEye in exchange for that compensation.  I also agreed that part of that compensation was to be withheld until April 2020 when the RTO with Rision was scheduled.

109.     The unpaid portion of my promised compensation is $497,000.

110.     During my engagement with Overwatch/BioEye, I developed the Morinville Intellectual Property for Overwatch/Bioeye.  I did not assign my rights to the Morinville Intellectual Property to anyone.

111.     Overwatch/BioEye has since broken apart into Overwatch and BioEye. This caused the RTO to fail.

112.     BioEye now exclusively controls the Morinville Intellectual Property, continues to sell the Morinville Intellectual Property, and has contracted with at least with the AFL and Cosenza Hospital in Italy for use of the Morinville Intellectual Property.

113.     The Defendants have refused to pay me the value of my agreed upon unpaid compensation and have been unjustly enriched by at least that amount.  I have suffered damage at least at that amount as a result.

## Claim 2

### Breach of Contract

114. The Factual Allegations above are incorporated in this Claim as is if they are rewritten here.

115. In July 2019, Overwatch/BioEye entered into a contract with me to obtain my services in product marketing and product management in exchange for certain compensation consisting of monthly fees and equity in Rision.

116. Pursuant to the terms of this contract, Overwatch/BioEye agreed to compensate me with monthly fees of $15,000 and 2% of the shares in the post RTO Rision in exchange for product marketing and management work that I perform for Overwatch/BioEye. I agreed to perform this work for Overwatch/BioEye in exchange for that compensation. I also agreed that part of that compensation was to be withheld until April 2020 when the RTO with Rision was scheduled.

117. During my engagement with Overwatch/BioEye, I developed the Morinville Intellectual Property for Overwatch/Bioeye.

118. The Defendants caused the breakup of Overwatch/BioEye. This breakup caused the RTO to fail.

119. The Defendants now breach the contract by claiming that Overwatch/BioEye never existed, and therefore BioEye has no obligation to pay me. Yet BioEye has taken exclusively control and possession the Morinville Intellectual Property, which I developed for Overwatch/BioEye, but BioEye alone profits from the Morinville Intellectual Property by its contracts with at least with the AFL and Cosenza Hospital in Italy for use of the Morinville Intellectual Property. I did not assign my rights to the Morinville Intellectual Property to anyone.

120.    I performed my part of the agreement, and I am damaged because I was not paid the withheld portion of my compensation which is $497,000.

## Claim 3

## Quantum Meruit

121.    The Factual Allegations above are incorporated in this Claim as is if they are rewritten here.

122.    During my engagement with Overwatch/BioEye I performed valuable services in research, marketing, product development and other services to create the Morinville Intellectual Property for the Defendants who accepted, use and enjoy the Morinville Intellectual Property to perform the AFL contract and under the circumstances they were reasonably notified that I expected to be paid for my services because in July 2019, Overwatch/BioEye agreed to compensate me with monthly fees of $15,000 and 2% of the shares in the post RTO Rision in exchange for product marketing and management work that I perform for Overwatch/BioEye.  I agreed to perform this work for Overwatch/BioEye in exchange for that compensation.  I also agreed that part of that compensation was to be withheld until April 2020 when the RTO with Rision was scheduled.

123.    During my engagement with Overwatch/BioEye, I developed the Morinville Intellectual Property (see paragraphs 25 to 44) for Overwatch/Bioeye.

124.    The Defendants caused Overwatch/BioEye to be broken apart into Overwatch and BioEye. This caused the RTO to fail.

125.    The Morinville Intellectual Property is valuated at approximately $38 million dollars.

126.    BioEye has taken exclusively control and possession the Morinville Intellectual Property, and BioEye alone profits from the Morinville Intellectual Property by its contracts with at least with the AFL and Cosenza Hospital in Italy for use of the Morinville Intellectual Property.

127.    The Defendants claim that Overwatch/BioEye never existed and as a result the agreement is between me and Overwatch and there is no agreement between me and BioEye.

128.    BioEye unjustly has exclusive possession and control of the Morinville Intellectual Property; there is no contract between me and BioEye, yet the Defendants knew I expected compensation; and I have not been paid for the Morinville Intellectual Property.

129.    The Defendants should pay me $38 million dollars under the theory of Quantum Meruit as I am damaged by the loss of the Morinville Intellectual Property by that amount.


## Claim 4

### Fraud

130.    The Factual Allegations above are incorporated in this Claim as is if they are rewritten here.

131.    From the time I was approached to work for Overwatch/BioEye it was represented to me that Overwatch and BioEye had merged into a single entity. This fact was repeated to me throughout the course of my engagement with Overwatch/BioEye including: (1) the draft Overwatch/BioEye Corporate Presentation (Exhibit 37) dated October 25, 2019, which shows in a timeline on page 16 that Overwatch acquired BioEye and which I was asked to edit on October 27, 2019 (Exhibit 36); (2) I participated in the creation of the Overwatch/BioEye organizational chart (Exhibit 12) starting in December 2019 (Exhibit 35) and continuing until its

completion on January 24, 2020, which shows that Overwatch/Bioeye is a single, unified entity;
(3) Exhibit 38 is the Overwatch Digital Health Executive Business Summary dated December
12, 2019 that states in the Overview: "Overwatch Digital Health, Inc. and its wholly owned
subsidiary, BioEye, Ltd…" which was sent to me on December 12, 2019; (4) Under Overwatch,[8]
I drafted the extensive documentation for emergency use authorization by the FDA so that
Overwatch IDT could obtain FDA approval for use as an early warning sepsis detection product
(see Exhibit 22) and I applied for National Institute of Health RADx grants (see Exhibit 27);[9] (5)
the letter to Overwatch/BioEye Convertible Note and Promissory Note Holders seeking further
investment (Exhibit 8) dated March 27, 2020 which notes that Overwatch acquired BioEye; and
(6) many other documents that show that the Defendants at all times represented to me that
Overwatch/BioEye was a single unified entity.

     132.    The Defendants were aware of, reviewed, revised, commented on, and authorized
each of these documents.  The Defendants knew or should have known that I was provided these
documents in my role with Overwatch/BioEye or because I was requested to assist
Overwatch/BioEye with its capital raising and because some documents I participated in drafting
(Exhibits 12, 22 and 27) or was asked to edit (Exhibit 36).

     133.    Furthermore, Defendants saw the documents that I drafted and submitted to
various regulatory agencies for grants and funding related to Overwatch IDT. Documents that
claim that Overwatch was the owner of Overwatch IDT.  If Overwatch was not the owner of
Overwatch IDT (as Defendants now allege) or that Overwatch had not merged with BioEye, the
Defendants had a duty to correct this misrepresentation.  But they did not correct it.

---

[8] The emergency use authorization application filed with the FDA and the RADx application were filed solely by
Overwatch; further proof that Overwatch and BioEye had merged into one single entity.
[9] Dovi Yellen contributed technical information to this application.

134.    The Defendants, knowing that their representation that Overwatch had acquired BioEye and was a single unitary entity was false, continued to represent to me that the companies remained merged with the intent that I would rely on their false representation to induce me to create the Morinville Intellectual Property that they could later take.

135.    The Defendants completed their fraud by running Overwatch/BioEye out of money, refusing to allow Overwatch/BioEye to accept new funding, and failing to disclose to the existence of the secret AFL contract in the RTO application filed with the ASX, which caused Overwatch/Bioeye to fail and the RTO to fail.  BioEye then took possession and control of the Morinville Intellectual Property.

136.    The Defendants now claim that Overwatch/BioEye never existed because the two companies have always been separate entities.  Therefore, the Defendants knew that their representation that the companies had merged was false for the very beginning.

137.    The Defendants misrepresented that the companies had merged with the intent to induce me to rely upon it, and act upon it, to create the Morinville Intellectual Property.  I did rely upon it, and I did act upon it, and I did create the Morinville Intellectual Property.

138.     I suffered injury by actively and justifiably relying on the Defendant's representation that Overwatch and BioEye were merged, but because that representation was false, BioEye was able to abscond with the Morinville Intellectual Property and not pay me.

139.    The Defendant's fraudulent actions have unjustifiably benefited them with unauthorized use, possession, and control of the Morinville Intellectual Property that has been valuated at approximately $38 million dollars.  I have suffered damages by at least that amount, plus my lost compensation and losses of my research, documents, time, ideas, reputation, and more.

140.    The previous statements show the who, what, when, where, and how required by Rule 9(b), and put the Defendants on fair notice of my fraud claims.  Thus, I have satisfied the pleading requirements of Rule 9(b).

## Claim 4

### Other Claims

141.    The Factual Allegations above are incorporated in this Claim as is if they are rewritten here.

142.    I am not a lawyer, but I believe that other claims apply such as intentional misrepresentation, misappropriation of intellectual property, civil conspiracy, breach of fiduciary duty, duty of care or breach of duty of good faith and fair dealing, intellectual property theft, or some other tort.  The gravamen of my complaint is that Defendants – collectively and individually and in their capacity as members of the board of directors, or in their personal capacity – engaged in behaviors that caused damage to me.

V. *Relief: State Briefly exactly what you want the court to do for you.  Make no legal arguments and do not cite cases or statutes. Attach additional pages if necessary.*

I pray the Court will assign the Morinville Intellectual Property to solely to me.

I pray the Court will award my full compensation according to the agreement with Overwatch/BioEye of $499,000.

I pray that the Court will award an appropriate amount under the theory of Quantum Meruit as is determined by this court related to the value of the Morinville Intellectual Property.

I pray the Court will award additional damages based on the Defendant's fraud as is appropriately determined by the court.

I pray that the Court award additional damages in relation to the cost of my time preparing and litigating this case, and all filing fees and associated costs.

V. *Relief: State Briefly exactly what you want the court to do for you. Make no legal arguments and do not cite cases or statutes. Attach additional pages if necessary.*

I pray the Court will assign my Technology and Intellectual Property to solely to me.

I pray the Court will award my full compensation according to the agreement with Overwatch/BioEye of $499,000.

I pray that the Court will award an appropriate amount as is determined by this court related to the value of my Technology and Intellectual Property.

I pray the Court will award additional damages based on the Defendant's fraud as is appropriately determined by the court.

I pray that the Court award additional damages in relation to the cost of my time preparing and litigating this case, and all filing fees and associated costs.

Signed this 10th day of February 2022.

_____

I declare (certify, verify or state) under penalty of perjury that the foregoing is true and correct.

Executed on: 10FEB2022

_____
                              Signature of plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2022, the forgoing document was served by U.S.P.S. first class mail, postage prepaid and email on the following parties:

Overwatch Technologies, Inc.
17440 Dallas Parkway
Suite 230
Dallas, TX 75287
Email: terry.fokas@overwatchdh.com


Lenard M. Parkins
R.J. Shannon
Pennzoil Place
700 Milam Street, Suite 1300
Houston, TX 77002
Email: lparkins@parkinslee.com
rshannon@parkinslee.com


Date: 10FEB2022

Paul Morinville
3902 Sequoia Trail West
Georgetown, TX 78628
(512) 294-9563
Paul@Morinville.net